**AEROGLIDE CORPORATION, Plaintiff-Appellee,**

v.

**William A. ZEH, Robert W. Gillispie, Jr., Isidore Krupski, Harold E. Goodale, Alfred W. Topping, Joseph P. Celic, Thomas H. White, J. Dwight Reeve, John P. Kujawski, Joseph Sieminski and Walter Truskolaski, Defendants-Appellants.**

No. 155, Docket 27096.

United States Court of Appeals Second Circuit.

Argued Dec. 14, 1961.

Decided April 10, 1962.

Reginald C. Smith, Riverhead, N. Y. (Griffing, Smith, Tasker & Lundberg and Solomon Raffe, Riverhead, N. Y., on the brief), for defendants-appellants.

Harold Harper, New York City (Harper & Matthews, New York City, on the brief; Thomas D. Green, Jr., New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, Chief Judge, and MOORE and HAYS, Circuit Judges.

MOORE, Circuit Judge.

Defendants-appellants appeal from a judgment holding them jointly and severally liable for $13,302.51 with interest, the amount remaining due upon machinery purchased from plaintiff-appellee, Aeroglide Corporation (Aeroglide), by Suffolk Farmers Cooperative Association, Inc. (the Cooperative) of which they were directors. The case was tried to the court without a jury. Jurisdiction is based upon diversity of citizenship, appellants being citizens of New York and appellee being a North Carolina corporation.

The defendants were farmers. They served the Cooperative as directors without salary. On May 23, 1956, Cooperative's board of directors, after discussing proposals submitted by Aeroglide, constituted Zeh, Gillispie, Krupski and Prusinowski (now deceased), a committee to negotiate for the purchase of certain machinery by the Cooperative. The committee visited Aeroglide's plant in Raleigh, N. C., and on May 28, 1956, the Cooperative's president, Zeh signed a contract for the purchase of grading and packaging machinery at a cost of $61,000. Other orders were given by telephone and, except for one parts order, were confirmed in writing. On the face of the written proposals, contracts and confirmations appeared the words "(subject to conditions printed on reverse side of this sheet)" and on the reverse side under "CONDITIONS" the statement that "Legal title to the equipment will remain in the Seller until full payment as herein stipulated has been received by Seller. Buyer agrees to do anything necessary to see that title so remains in the Seller."

Thereafter and on May 31, 1956, the board of directors was advised of the committee's action and authorized the payment of one-third ($20,333.33) of the contract purchase price ($61,000). Between May 18 and November 12, 1956, the Cooperative had purchased from Aeroglide machinery, the total price of which was $84,922.96 and up to January 8, 1957, had paid $71,620.45, leaving $13,302.51 unpaid.

On and prior to February 26, 1957, the Cooperative was indebted to Springfield Bank for Cooperatives, Springfield, Massachusetts (the Bank) for some $75,000, and was being pressed by the Bank for security as a condition to a further extension. Without Aeroglide's knowledge or consent, on February 26, 1957, the board of directors, Zeh, Goodale, Topping, White, Reeve, Kujawski, Sieminski and Truskolaski, voting in favor of the resolution, Gillispie, Krupski and Celic, being absent and not voting, authorized the execution and delivery of a chattel mortgage to the Bank of all machinery and equipment on hand which included all the machinery purchased from Aeroglide except two items costing some $4,000. On February 27, 1957, Zeh as president and Krupski as treasurer executed a chattel mortgage in favor of the Bank of all the machinery purchased from plaintiff with the above-mentioned exceptions. Subsequently in September, 1957 the assignee for the benefit of the Cooperative's creditors sold the tangible personal property including the machinery covered by the mortgage and realized $39,968.19 thereon.

The legal situation was as follows: the sales agreements reserving title in Aeroglide had never been filed. Therefore, whereas the agreements were valid as between Aeroglide and the Cooperative,[1] they were not binding upon the Bank which took the mortgage without notice.[2] In effect the action of the directors in authorizing the mortgage on

1. Stewart & Co. v. Rivara, 274 U.S. 614, 47 S.Ct. 718, 71 L.Ed. 1234 (1927), affirming Rivara v. Stewart & Co., 241 N.Y. 259, 149 N.E. 851 (1925); In re Lake's Laundry, 79 F.2d 326, 102 A.L.R. 247 (2d Cir. 1935), cert. denied, 296 U.S. 622, 56 S.Ct. 144, 80 L.Ed. 442 (1935); In re White Plains Ice Service Inc., 109 F.2d 913 (2d Cir. 1940).

2. Rodney Hunt Machine Co. v. Stewart, 57 Hun. 545, 11 N.Y.S. 448 (3rd Dept. 1890). See also Ryerson & Son, Inc. v. O'Donnell, Inc., 279 N.Y. 109, 17 N.E.2d 788 (1938).

February 26, 1957, was to transfer Aeroglide's property to the Bank. Alleging that this act by the participating directors constituted a conversion of its property, Aeroglide claims the unpaid purchase price as damages. The trial court found that the value of the machinery was in excess of the unpaid $13,302.51 and awarded a judgment in this amount.

■ ■ Aeroglide concedes that the directors are not liable for the conversion merely because they were directors and officers of the corporation at the time. "The ordinary doctrine is that a director, merely by reason of his office, is not personally liable for the torts of his corporation; he must be shown to have personally voted for or otherwise participated in them." Fletcher, Private Corporations § 1137 (perm. ed. rev. repl. 1947). This rule was recently cited with approval in Armour & Co. v. Celic, 2 Cir.1961, 294 F.2d 432, 439, which involved a suit on another transaction against eight of these same directors. The law of New York, the place of the wrong, is applicable. Under New York law, the execution and delivery of a chattel mortgage, without transfer of possession, affecting property to which the mortgagor has not acquired title, constitutes a conversion. "The conditional vendee is still, in effect, the vendor's bailee, and, as such, remains liable to the vendor for any conversion of the goods." (Rodney Hunt Machine Co. v. Stewart, 57 Hun. 545, 552, 11 N.Y.S. 448, 451 (3rd Dept., 1890).) See also Kominz Tire Co. v. Universal Credit Co., 258 App.Div. 774, 14 N.Y.S.2d 840 (4th Dept., 1939); Credit Acceptance Corp. v. Fohl, 251 App.Div. 796, 296 N.Y.S. 777 (4th Dept., 1937).

■ Appellants concede that personal participation would appear to be sufficient to place liability on a corporate director and cite a fairly recent New York case (Melnick v. Sable, 11 A.D.2d 1075, 206 N.Y.S.2d 825, 826 (Second Dept., 1960)) for the proposition that "such liability [for conversion] accrues only against the individual officer who consummated the conversion through his personal action." As stated in Passaic Falls Throwing Co. v. Villeneuve-Pohl Corp., 169 App.Div. 727, 729, 155 N.Y. S. 669, 670 (1st Dept., 1915), "every person is liable who personally or by agent commits an act of conversion, or who participates by instigating, aiding, or assisting another."

■ ■ Upon this very theory, the trial court held the directors liable because they did personally participate in the acts constituting conversion, namely, by authorizing the execution of the chattel mortgage. That there was no direct evidence in the record that the directors were aware of Aeroglide's security interests is not determinative. The tort of conversion requires no intent or fault. The determinative question then is whether these directors personally participated in the conversion which resulted from the execution and delivery of the mortgage. Appellants Zeh and Krupski are liable because they signed the mortgage; this is clearly personal participation in the act constituting conversion even though done on behalf of the corporation. Personally voting for the mortgage as a director is also sufficient participation. Management of the corporation is vested in the board of directors,[3] and the vote authorizing the execution of the mortgage must be viewed as the basic act from which the conversion resulted. While it is true that there could be no conversion until execution and delivery of the mortgage, the latter are formalities which flow in the normal course of events from the affirmative action taken by the directors.

■ The only remaining question concerns the liability of Gillispie and Celic. They did not attend the directors' meeting, and, therefore, did not vote for the mortgage as directors. They were among the holders of two-thirds of the shares outstanding who consented in writing to the execution of the mortgage before

---

3. New York General Corporation Law, § 27.

the vote of the directors.[4]  However, Aeroglide does not seek to hold Gillispie and Celic liable as stockholders.  Nor would the action of the stockholders have been a conversion in itself; the directors' resolution and the execution of the mortgage were necessary to transfer the title.

The natural inclination on the facts of this case is to treat all of these directors alike, and it may be somewhat inequitable to hold that two directors are not liable simply because they failed to appear at a directors' meeting.  Yet liability for conversion is imposed not upon the basis of fault but for actions taken, however innocently.  Thus, any inequality results from the nature of the tort.  We, therefore, reverse as to Gillispie and Celic, and affirm the judgment entered against the other appellants.

---

4.  New York Stock Corporation Law, § 16.